

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-17-1998

# SEC v. Black

Precedential or Non-Precedential:

Docket 98-3345

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"SEC v. Black" (1998). *1998 Decisions.* Paper 278.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/278

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 17, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-3345

SECURITIES AND EXCHANGE COMMISSION

v.

JOHN GARDNER BLACK; DEVON CAPITAL
MANAGEMENT, INC.; FINANCIAL MANAGEMENT
SCIENCES, INC.

SOUTH BUTLER COUNTY SCHOOL DISTRICT; DANIEL
BOONE AREA SCHOOL DISTRICT; TYRONE AREA
SCHOOL DISTRICT; BLACKLICK VALLEY SCHOOL
DISTRICT; HARMONY AREA SCHOOL DISTRICT; PENN
CAMBRIA SCHOOL DISTRICT; PENNS MANOR SCHOOL
DISTRICT; NORTHERN LEBANON SCHOOL DISTRICT*,
(*Pursuant to Rule 12(a), F.R.A.P.),
        Appellants

BELLEFONTE AREA SCHOOL; CORNWALL-LEBANON
SCHOOL DISTRICT; CUMBERLAND VALLEY;
FLEETWOOD AREA SCHOOL; NORTH HILLS SCHOOL
DISTRICT; HARRISBURG AUTHORITY; CITY OF
HARRISBURG; ST JOHNS WELFARE; LINCOLN
CONSOLIDATED SCHOOL; NICE COMMUNITY SCHOOL;
YALE PUBLIC SCHOOL; BRADFORD REGIONAL MEDICAL
CENTER; RAVENSWOOD HOSPITAL MEDICAL CENTER;
UNIVERSITY OF SCRANTON*
(*Intervenors-Appellees see order of 8/11/98)

PENN MANOR SCHOOL DISTRICT;
SCHOOL DISTRICT OF LANCASTER*
(*Amici-Appellees see order of 8/19/98)

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. 97-cv-02257)

Argued September 14, 1998

Before: SLOVITER, ALITO, RENDELL Circuit Judges

(Filed December 17, 1998)

Richard R. Nelson, II, Esq. (Argued)
Cohen & Grigsby
11 Stanwix Street
15th Floor
Pittsburgh, PA 15222-3115
 Attorney for appellants

Richard A. Finberg, Esq.
Malakoff, Doyle & Finberg
The Frick Building
Suite 200
Pittsburgh, PA 15219
 Attorney for appellant,
 South Butler County School
 District

David A. Gradwohl, Esq.
Fox, Rothschild, O'Brien & Frankel
1250 South Broad Street
P.O. Box 431, Suite 1000
Lansdale, PA 19446
 Attorney for appellant,
 Daniel Boone Area School District

Michael J. Betts, Esq.
Betts & Perry
235 Alpha Drive
Pittsburgh, PA 15238
 Attorney for appellant,
 Tyrone Area School District

James H. McConomy, Esq.
David G. Oberdick, Esq.
Titus & McConomy
Four Gateway Center
20th Floor
Pittsburgh, PA 15222
 Attorneys for appellant,
 Blacklick Valley School District

Mark A. Rush, Esq.
Kilpatrick & Lockhart
1500 Oliver Building
Pittsburgh, PA 15222
 Attorney for appellees

Dennis M. Sheedy, Esq. (Argued)
George M. Medved, Esq.
Sharon F. DiPaolo, Esq.
Pepper, Hamilton & Scheetz
500 Grant Street
5000 One Mellon Bank Center
Pittsburgh, PA 15219
 Attorneys for intervenor-appellee,
 Richland School District

Thomas A. French, Esq.
Rhoads & Sinon
One South Market Square
12th Floor
P.O. Box 1146
Harrisburg, PA 17108-1146
 Attorney for intervenors-appellees,
 Bellefonte Area School, Cornwall
 Lebanon School District,
 Cumberland Valley, Fleetwood
 Area School

Michael J. Witherel, Esq
966 Perry Highway
Pittsburgh, PA 15237
 Attorney for intervenor-appellee,
 North Hills School District

3

Timothy P. Ryan, Esq.
Eckert, Seamans, Cherin & Mellott
600 Grant Street
42nd Floor
Pittsburgh, PA 15219
 Attorney for intervenors-appellees,
 Harrisburg Authority, City of
 Harrisburg

Joseph F. McDonough, Esq.
Mary-Jo Rebelo, Esq.
Manion, McDonough & Lucas
600 Grant Street
Suite 882
Pittsburgh, PA 15219
 Attorneys for intervenor-appellee,
 St. Johns Welfare

Philip A. Erickson, Esq.
Thru, Maatsch & Norberg
501 South Capitol Avenue
Suite 500
Lansing, MI 48901-7899
 Attorney for intervenors-appellees,
 Lincoln Consoladated School, Nice
 Community School, Yale Public
 School

Alan J. Steinberg, Esq.
Horty, Springer & Mattern
4614 Fifth Avenue
Pittsburgh, PA 15213
 Attorney for intervenor-appellee,
 Bradford Regional Medical Center

George J. Arnold, Esq.
Sosin & Lawler
11800 South 75th Avenue
Suite 300
Palos Heights, IL 60463
 Attorney for intervenor-appellee,
 Ravenswood Hospital Medical

4

Charles B. Gibbons, Esq.
Klett, Lieber, Rooney & Schorling
One Oxford Centre
40th Floor
Pittsburgh, PA 15219-6498
 Attorney for intervenor-appellee,
 University of Scranton

Kevin M. French, Esq.
Hartman, Underhill & Brubaker
221 East Chestnut Street
Lancaster, PA 17602
 Attorney for Amici-appellees, Penn
 Manor School District, School
 District of Lancaster

OPINION OF THE COURT

RENDELL, Circuit Judge

We are asked on this appeal to determine whether the District Court erred in releasing the funds of certain investors from a freeze order entered in the context of receivership proceedings instituted by the Securities and Exchange Commission. Appellants are several Pennsylvania school districts who invested funds with defendants. They contend that the District Court orders of May 11 and May 22, 1998 improperly released funds of other investors, denied appellants certain procedural rights in connection with the court proceedings attendant thereto, and also erred in its award of attorneys' fees to the equity receiver appointed in the case. Appellees not only counter these positions, but also challenge our jurisdiction to hear this appeal.

Appellants appeal from five orders entered by the District Court in the ongoing receivership proceedings instituted by the SEC against John Gardner Black ("Black"), Devon Capital Management, Inc. ("Devon"), and Financial Management Sciences, Inc. ("FMS") under the provisions of Section 20(b) of the Securities Act, 15 U.S.C. S 77t(b), Sections 21(d) and (e) of the Exchange Act, 15 U.S.C.

5

S 78u(d), (e), and Section 209(d) of the Advisors Act, 15 U.S.C. S 80b-9(d). The five orders at issue include an April 7, 1998 order approving payment of attorneys' fees and expenses ("fee order"), an April 22, 1998 order adopting procedures for a hearing regarding the distribution of funds and an April 27, 1998 order modifying the April 22 order ("procedural orders"), and a May 11, 1998 order modifying a freeze order and a May 22, 1998 order modifying the May 11 order ("orders lifting the freeze").

For the reasons set forth below, we will affirm the procedural orders and the orders lifting the freeze.

I. BACKGROUND

In August 1997, during a routine investigation of Devon, the SEC discovered that Devon was carrying assets on its books at materially inflated values and had incurred massive trading losses totaling at least $50 million of the $345 million entrusted to it by its investment clients. The investigation also determined that Devon and Black 1 were concealing the losses from their clients, most of whom were school districts and governmental entities, and were continuing to accept funds from new investment clients without disclosing information regarding these losses. The SEC believed that Devon was seeking new clients so as to use their funds to fulfill obligations to existing clients under their investment advisory agreements. On September 26, 1997, the SEC filed an action in the United States District Court for the Western District of Pennsylvania against Black, Devon and FMS seeking to enjoin their illegal conduct and freeze their assets pending an investigation. The SEC alleged violations of Section 17(a) of the Securities Act, 15 U.S.C. S 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. S 78j(b), and Rule 10b-5, 17 C.F.R.S 240.10b-5, promulgated thereunder against Black, Devon and FMS, and violations of Sections 206(1), (2) and (4) of the Investment Advisers Act of 1940, 15 U.S.C. SS 80b-6(1),

_____

1. Black was the president, portfolio manager, and sole shareholder of Devon, a registered investment adviser, headquartered in Tyrone, Pennsylvania. Black was also the owner of FMS, an entity affiliated with Devon and incorporated in Pennsylvania.

6

80b-6(2), 80b-6(4), and Rule 206(4)-2, 17 C.F.R. S 275.206(4)-2, promulgated thereunder against Black and Devon.

The District Court granted the SEC's motion for entry of a temporary restraining order whereby all assets "presently held by [defendants], under their control or over which they exercise actual or apparent investment or other authority, in whatever form such assets may presently exist and wherever located" were to be immediately frozen. The order was entered pursuant to Section 20(b) of the Securities Act, 15 U.S.C. S 77t(b), Sections 21(d) and (e) of the Exchange Act, 15 U.S.C. S 78u(d), (e), and Section 209(d) of the Advisors Act, 15 U.S.C. S 80b-9(d). Pursuant to this order, the customer accounts later categorized as A, B, C and D were frozen.

The court appointed Richard Thornburgh as the equity receiver ("Trustee"), and he employed Price Waterhouse, LLP to provide accounting and auditing services for the ensuing investigation. The Trustee identified four general categories of investment relationships between defendants and their investor clients. Category A clients entered into an investment advisory and management relationship with Devon whereby Devon had authority to direct the purchase and sale of securities investments held in the name of the client at the client's custodian bank. Category A includes clients who entered into investment management arrangements whereby the client bore the risk and benefit of performance of investments, clients with investment advisor arrangements with a guaranteed minimum rate of return whereby Devon bore the risk of investments, and clients with investment advisor arrangements with a fixed rate of return whereby Devon bore the risk, and would reap the benefit, of investments. Category B includes those clients who entered into Repurchase Agreements ("Repos") and Non-Pooled Collateralized Investment Agreements ("CIAs") with defendants. Under Repos, Devon used client funds to buy securities, chosen by Devon, at a set price, and later would re-sell the securities at a set, higher price, providing an assured return. The securities were held in the interim in the client's name by a custodian bank which held a promise of Devon's repurchase obligation. The Repos

7

required Devon to provide additional securities on behalf of the client if the securities' value fell below the set purchase price. Under non-pooled CIAs, Devon used clients' funds to invest in FMS "units" that were credited to the client's account. FMS promised a fixed rate of return to the client and granted the client a security interest in securities held by a custodian bank. Category C clients entered into agreements with Devon similar to B non-pooled CIAs, except that the securities serving as collateral for the FMS "units" were pooled in one account in the name of FMS at Mid-State Bank ("MSB"). Category D clients entered into investment management arrangements with Devon similar to the A clients, except that MSB served as the custodian of the D accounts. As with the A and B accounts, the D accounts were held in the clients' names. Pursuant to the foregoing agreements, the defendants managed the accounts of A, B and D clients, while the actual funds or securities of those clients remained either in their own names or with a custodian bank named by them, other than MSB. The funds and/or securities invested by clients of the C accounts were maintained in a pooled account in the name of FMS in its principal depository bank, MSB. The present shortfall in assets is primarily in the pooled account at MSB. As of September 30, 1997, although approximately $156,000,000 had been invested in pooled CIAs on behalf of the C clients, the value of the collateral underlying the pooled account was only approximately $86,000,000.

After assessing the different types of contractual arrangements that existed, the Trustee investigated the extent to which defendants used the pooled account holding the C clients' funds in order to sell securities to, purchase securities from, or grant collateral to, clients that were in the other categories of investment relationships with defendants. The Trustee believes that through the use of the pooled account, defendants may have used certain funds deposited by the C clients for the benefit of the A, B and D clients. The Trustee has attempted to identify and quantify examples of such transactions, using the term "cash taints" to refer to cash transfers from the pooled account to accounts of non-pooled clients without the receipt of consideration, and the term "securities taints" to

8

refer to transfers of securities between pooled and non-pooled clients at non-market prices, benefitting the non-pooled clients at the expense of the pooled account. 2 In addition, evidence suggests that defendants used the pooled account to fund lawsuits, settle complaints, and pay FMS's operational expenses. The Trustee has not alleged any complicity or actual involvement of the holders of the A, B and D accounts in this allegedly fraudulent scheme under investigation by the SEC.

Following the initial freeze order, the Trustee and the SEC jointly filed a motion on October 27, 1997 to modify the freeze to allow a distribution to the A, B and D clients of 50% of the market value of the funds held in their name, and to allow a distribution to the C clients of 50% of the market value of their pro rata share of the assets held in the pooled account. The District Court entered an order to allow this proposed distribution. On March 10, 1998, the Trustee filed a motion for further modification of the freeze to permit a second distribution to the investment advisory clients. This motion proposed a distribution to the A, B and D clients of 90% of the assets held in their name, reduced by the estimated total dollar value of whatever "taints" were identified by the Trustee, and a distribution to the C clients of 90% of their pro rata share of the remaining market value of the assets in the pooled account. The Trustee requested that funds sufficient to cover the alleged tainted transactions remain subject to the freeze pending afinal resolution by the court concerning the entitlement to such funds. On March 18, 1998, the District Court entered an order setting an April 29, 1998 hearing date on the motion for the proposed second interim distribution. The court also allowed all investment clients to file any objections to the motion with the Trustee and the SEC. On April 22, 1998 the District Court entered a hearing management order setting forth the procedures to be followed during the April 29, 1998 hearing. In response to an emergency motionfiled by several of appellants, the court revised these procedures in an April 27 order. The District Court conducted a

_____

2. Spread sheets prepared by Price Waterhouse indicated possible cash taints totaling approximately $3.1 million and possible securities taints totaling approximately $20.8 million.

9

hearing on the motion for a second distribution on April 29 and April 30. In a Memorandum Opinion entered May 11, 1998, the District Court directed the Trustee to release the funds of all A, B and D clients from the freeze, and to distribute to the C clients 90% of each client's pro rata share of the remaining pooled assets. The order also granted the C clients permission to initiate actions against the A, B and D clients to recover alleged taints. The District Court revised the May 11 order in an order entered May 22, whereby the court discussed the method of distribution of funds to the C clients and granted all C clients the right to intervene in this action. In addition, on April 7, 1998, the District Court issued an order approving the Trustee's application for payment of attorneys' fees and expenses of approximately $1.6 million.

The District Court receivership proceedings are still pending. On July 7, 1998, several of the C clients, representing a subset of appellants, instituted involuntary Chapter 7 bankruptcy proceedings against Devon and FMS in the United States Bankruptcy Court for the Western District of Pennsylvania. Although the Trustee moved to dismiss the Bankruptcy Court proceedings based upon his view that the receivership before the District Court was adequate, the Bankruptcy Court declined to do so, ruling that:

> In spite of the arguments by the trustee, we are not sufficiently persuaded that dismissal at this time would better serve the interests of debtors and their creditors. We instead find it advisable to permit these bankruptcy cases to proceed to determine whether they provide a better process for resolving issues left unresolved by the district court.

The appeals before us have resulted in a flurry of activity and filings by various parties, including motions on behalf of many of the A, B and D investors to intervene, which we granted. In addition to appellants' brief, the School District of Lancaster and Penn Manor School District havefiled an amicus brief requesting that the orders lifting the freeze be affirmed. Intervenors Bellefonte Area School District, Cornwall-Lebanon School District, Cumberland Valley School District, Fleetwood Area School District, and

10

Richland School District filed a brief urging that the instant appeal be dismissed or that the District Court orders appealed from be affirmed. Intervenor North Hills School District filed a brief urging that the appeal be dismissed or that the orders appealed from be affirmed. Intervenor Richland School District filed a brief urging this court to affirm the orders lifting the freeze and to reverse the fee order, except to the extent that such reversal would require Richland to contribute in payment of such fees. Intervenors St. Johns Welfare Federation, The Harrisburg Authority and The City of Harrisburg, The University of Scranton, and Bradford Regional Medical Center filed a brief urging this court to affirm the orders lifting the freeze. We requested the filing of a brief by the SEC. The only party not actually before us on this appeal is the Trustee.3

## II. JURISDICTION

We first address the contested issue of our jurisdiction to review the orders of the District Court from which this appeal has been taken.

In view of the continued existence and effectiveness of the restraining order for several months from and after September 1997, we conclude that it had effectively matured into a preliminary injunction. See Nutrasweet Co. v. Vit-Mar Enter., 112 F.3d 689, 692 (3d Cir. 1997) (holding that a TRO in effect for 77 days was equivalent to a preliminary injunction); see also Sampson v. Murray, 415 U.S. 61, 88 (1974) (holding that the continuation of a TRO beyond its authorization had the same effect as a preliminary injunction); In re Arthur Treacher's Franchisee Litig., 689 F.2d 1150, 1153-54 (3d Cir. 1982) (holding that the TRO in effect beyond its statutory limits was effectively a preliminary injunction even though the parties consented to its extension). The orders lifting the freeze, therefore,

_____

3. The District Court determined, for reasons not apparent to us on the record before us, that the Trustee had a conflict of interest in this matter
and disqualified the Trustee from being a party to the matter on appeal. Although we would have welcomed the Trustee's views with respect to this matter, we believe that we have an adequate record based upon the briefs and argument of those parties to this appeal.

11

constituted orders modifying an injunction, from which an interlocutory appeal is permissible under 28 U.S.C. S 1292(a)(1), which provides jurisdiction over appeals from "[i]nterlocutory orders of the district courts . . . modifying . . . injunctions . . . ." Despite the characterization of this order by various parties as a "turnover" order and the District Court's own use of the phrase "return of 100% of the principal," the court's May 11 and May 22, 1998 orders merely lifted the freeze previously imposed on all funds, such that a freeze was no longer imposed on the A, B and D funds, but remained in effect on the C funds. 4 We, therefore, have jurisdiction to review the orders lifting the freeze.

Further, insofar as the appeals from the procedural orders complain of the denial of appellants' procedural rights in connection with the hearing which culminated in the modification of the freeze order, we view them as appealable along with, and as part of, the appeal from the orders lifting the freeze. See Energy Action Educ. Found. v. Andrus, 654 F.2d 735, 745 n.54 (D.C. Cir. 1980) (explaining that appellate review under S 1292(a)(1) extends to "all matters inextricably bound up with the[preliminary injunction]"), rev'd on other grounds sub nom., Watt v. Energy Action Educ. Found., 454 U.S. 151 (1981); see also 16 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure S 3921.1 (2d ed. 1987) (stating that review under S 1292(a)(1) "is not rigidly limited" but "properly extends to all matters inextricably bound up with the injunction decision").

The appeal of the fee order entered during the receivership stands on a different jurisdictional footing, and, we find, lacks a satisfactory footing. Appellants claim

_____

4. As stated in the September 26 freeze order, the freeze order did not involve an actual transfer of funds out of any accounts, but only involved notifying the financial institutions holding any frozen funds that they must "retain within [their] control and prohibit the withdrawal, removal, transfer or other disposal of any such funds or other assets." As such, the lifting of the freeze did not result in any movement or transfer of funds, but only removed the prohibition on the use or movement of these funds and notified the same financial institutions that they were now permitted to allow access to the previously frozen funds.

12

jurisdiction based on 28 U.S.C. S 1292(a)(2), the practical finality doctrine, and/or the collateral order doctrine. The practical finality doctrine does not provide jurisdiction for review since this doctrine only allows appellate review of judgments that are final except for ministerial or mechanical tasks and that conclusively determine the rights of the parties. See Forgay v. Conrad, 47 U.S. 201 (1848). In this case, the fee order awarding approximately $1.6 million in fees, which we assume would be paid from the pooled account, does not determine the rights of the parties to this litigation since the District Court has not yet determined ownership of the pooled account funds or ordered a final distribution of the receivership assets.5 See also Apex Fountain Sales, Inc. v. Kleinfeld, 27 F.3d 931, 935-36 (3d Cir. 1994) (holding that the practicalfinality doctrine did not apply to the order at issue since the court still had to determine the highly contested issue of the amount of damages and thus, more than merely ministerial tasks remained). The collateral order doctrine does not provide jurisdiction for review since this order is not, as required by this narrow doctrine, "separate from the merits" and "effectively unreviewable on appeal from afinal judgment." Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 375 (1981). Instead, this order, or at least the practical effect of this order, is intimately related to the undecided issue of the ownership of the pooled account funds and a final distribution of the receivership assets. In addition, there is no reason why this fee order could not be reviewed following a final judgment. See, e.g. , Law Offices of Beryl A. Birndorf v. Joffe, 930 F.2d 25 (7th Cir. 1991) (holding that a fee award is not appealable under the collateral order doctrine as it could be effectively reviewed following a final judgment because it did not cause irreparable harm in the interim).

_____

5. By addressing what appellants term "the practical finality doctrine," we do not intend to advance this doctrine as a viable means of obtaining appellate jurisdiction. As we noted in Kelly v. Mellon Bank E. Nat'l Assoc.
(In re Kelly), 876 F.2d 14, 15 (3d Cir. 1989), the practical finality doctrine as explained in Gillespie v. United States Steel Corp., 379 U.S. 148 (1964) has, at best, very limited viability.

Further, S 1292(a)(2) does not provide jurisdiction for the appeal from the fee order since this provision is interpreted narrowly to permit appeals only from the three discrete categories of receivership orders specified in the statute, namely orders appointing a receiver, orders refusing to wind up a receivership, and orders refusing to take steps to accomplish the purposes of winding up a receivership. See State St. Bank v. Brockrim, Inc., 87 F.3d 1487, 1490 (1st Cir. 1996) (holding that an order was not appealable under S 1292(a)(2) since it did not come within one of the three discrete categories described in the statute); SEC v. American Principal Holdings, Inc., 817 F.2d 1349, 1350 (9th Cir. 1987) (holding that an order confirming compensation payment to a receiver was not appealable under S 1292(a)(2)). This fee order is not of the same character as other orders that have been held to fit within the scope of S 1292(a)(2).

We will therefore only address the propriety of the orders lifting the freeze and the procedural orders entered by the District Court in connection therewith. We review the District Court's application of law with regard to the equitable receivership de novo, and its decisions relating to procedures it will follow in connection with the receivership proceedings for abuse of discretion. See American Telephone & Telegraph Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421,1427 (3d Cir. 1994).

III. STANDING

Before proceeding to the merits of the appeal, we must address intervenors' challenge to appellants' right to bring this appeal based on the fact that appellants were not parties to the underlying District Court action and were not granted intervenor status until the District Court's May 22, 1998 order. Intervenors base their argument on Marino v. Ortiz, 484 U.S. 301 (1988) (affirming judgments dismissing appeals of nonparties because of nonparty status). Marino is not controlling in this instance, however, since the nonparties at issue in Marino chose not to move to intervene, whereas in this case, appellants did so move. Marino only requires that a court deny an appeal from nonparties who have not obtained or sought intervenor

14

status, and that such nonparties "seek intervention for purposes of appeal." Id. at 304. The case at hand is also distinguishable from the other case cited by intervenors, SEC v. Wozniak, 33 F.3d 13, 15 (7th Cir. 1994). In Wozniak, the court held it had no jurisdiction over an appeal of two nonparties where one party never moved to intervene and the other party failed to appeal the denial of his motion to intervene. We find that appellants, who sought and were granted intervenor status as a matter of right in the District Court's May 22, 1998 order, have standing to bring this appeal. See Kowal v. Malkemus, 965 F.2d 1136, 1141 (1st Cir. 1992) ("Permission to intervene as of right endows the intervenor with appellate standing to challenge an adverse judgment entered in the adversary proceeding.").

## IV. PROPRIETY OF THE ORDERS LIFTING THE FREEZE

In its May 11, 1998 and May 22, 1998 orders, the District Court lifted the freeze as to the A, B and D clients' funds. We hold that the District Court did not err in so doing. We reject appellants' characterization of the District Court's May 11, 1998 and May 22, 1998 orders lifting the freeze. Contrary to appellants' urgings, the court did not, pursuant to these orders, adjudicate claims and decide that the A, B and D clients "are entitled to receive all of their funds" or that the C clients "should bear all of the $70,000,000 in losses." The court's orders did not distribute property, decide claims, or bar consideration of alleged taints. The order is clear that it did not decide claims, stating, "this Order does not constitute a final adjudication of any claims by or between investment advisory clients." Rather, the District Court only determined that, based upon the factual record regarding the relationship of the A, B, C and D accounts to the defendants, the court lacked power over the A, B and D funds. The Trustee's investigation revealed that the injunction initially imposed pursuant to the freeze order was overly broad, and the District Court therefore modified the terms of the restraint. The District Court did this after it was convinced "that the Defendants did not have `control' over funds maintained by Category A, B, or D clients. . .

15

so as to permit this Court to freeze the funds pursuant to 15 U.S.C. SS 78u(d) and (e)." Implicit in the District Court's ruling was a finding that the Trustee's investigation had not adduced any proof either that the Category A, B or D funds were, or could be deemed, assets of the defendants, or that the investors themselves were implicated as "wrongdoers" and thus within the purview of 15 U.S.C. SS 78u(d) and (e).6

The SEC argues in its brief that the District Court had the authority to impose and to continue the asset freeze over the A, B and D accounts pursuant to Federal Rule of Civil Procedure 66 since the freeze was part of an ongoing receivership proceeding governed by the jurisdictional provisions of the federal securities laws. 15 U.S.C. SS 77v(a), 78aa, 80b-14. However, the case law cited by the SEC actually supports the District Court's determination that the freeze as to these funds was improper because in no case referenced by the SEC has it been granted a freeze ex parte of assets where those assets were anything other than property, or deemed property, of a defendant or of a culpable third party. See, e.g., SEC v. Cherif, 933 F.2d 403, 413-14 (7th Cir. 1991) ("Nothing in the statute or case law suggests that 15 U.S.C. S 78u(d) or (e) authorizes a court to freeze the assets of a non-party, one against whom no wrongdoing is alleged."). Although the SEC and appellants cite many cases that they claim stand for the proposition that the SEC can freeze assets of a nonculpable third party, all of these cases are distinguishable from the case at hand. For example, in Deckert v. Independence Shares Corp., 311 U.S. 282, 284 (1940), where assets frozen were in the hands of a third party, the assets were clearly en route to the defendant and actually belonged to the defendant. In In re San Vicente Med. Partners Ltd., 962 F.2d 1402, (9th Cir. 1992), the frozen third-party assets at issue were owned by a limited partnership, whose general partner was a subsidiary of the defendant and thus, the defendant

_____

6. Although not stated, we assume it was crucial to the court's view that the C accounts should remain subject to the freeze, that these accounts were not merely accounts in the names of individual investors, but, rather, were commingled funds in a pooled account in the name of FMS at Mid-State Bank. They, clearly, were funds over which the defendants had control.

16

controlled the third party's property as a matter of law. See also SEC v. Colello, 139 F.3d 674 (9th Cir. 1998) (allowing the court to name an innocent third party as a "nominal defendant" in order to recover proceeds of fraud); SEC v. Wencke, 783 F.2d 829, 834 (9th Cir. 1986) (discussing claim of a nonparty based only on the decreased value of the nonparty's assets, not on the freezing of assets or a disgorgement order affecting the nonparty); SEC v. Universal Financial, 760 F.2d 1034 (9th Cir. 1985) (inapplicable because it relates to a stay of legal proceedings, as opposed to a freeze of assets, applicable to a nonparty); Tcherepnin v. Franz, 485 F.2d 1251, 1257 (7th Cir. 1973) (stating that the court could assume jurisdiction over land held by nonparties where the nonparties were not good faith purchasers for value and were instruments in defendants' fraudulent scheme); SEC v. Comcoa, Ltd., 887 F. Supp. 1521 (S.D. Fla.) (holding that funds in a trust account held by defendants' lawyer on behalf of defendants were subject to freeze), aff'd sub nom. Levine v. Comcoa, Ltd., 70 F.3d 1191 (11th Cir. 1995); SEC v. Antar, 831 F. Supp. 380 (D.N.J. 1993) (stating that the court could assume jurisdiction over illegal profits where such profits were held by the wife and children of defendant). The SEC also cites as support for its argument SEC v. Institutional Treasury Management, Inc., No. 91-6715 RG, 1991 SEC LEXIS 2791 (C.D. Cal. Dec. 12, 1991). This case does not support the SEC's argument, however, since in this case too the court released the funds of the innocent investors. See SEC v. Institutional Treasury Management, Inc., No. 91-6715 RG, 1991 SEC LEXIS 2915 (C.D. Cal. Dec. 23, 1991).

In addition, appellants do not argue complicity by the A, B and D investors, but contend that, under a "common enterprise" theory, the A, B and D accounts are liable for funds expended from the C accounts and used to the benefit of the investors having funds in A, B and D accounts. While we recognize the potential for recovery for the C investors from A, B and D investors who allegedly benefitted, this situation does not contain the level of complicity or involvement in wrongdoing on behalf of the A, B and D investors that is necessary to support the unilateral freeze of assets under the statute as occurred here. See, e.g., Cherif, 933 F.2d at 413-14 (district court

17

not authorized to freeze the assets of a non-party against whom no wrongdoing is alleged under 15 U.S.C. S 78u(d) or (e)). Although the Trustee's report discussed the existence of evidence showing commingling and transfers between the pooled and non-pooled accounts, there is no evidence that this was done by anyone other than defendants. Transfers or invasion of the pooled account for the benefit of others accomplished by FMS or Devon do not implicate the A, B and D investors in such a way as to make their assets the proper subject of a freeze based on defendants' wrongdoing.

Further, appellants' characterization of the District Court as having "refused" to decide the issue of who should bear the loss of the alleged "taints" is not entirely accurate. The District Court did not refuse to decide the "taints" issue, but, rather, this issue is, as it should be, reserved for another day. Nothing in the relinquishment of the freeze over the A, B and D accounts prevents the Trustee from pursuing the issue of "taints."7  Further, as has become clear from our review of the record of proceedings before the District Court and the Bankruptcy Court, the Trustee's pursuit of these causes of action to recover the taints from the A, B and D account holders has not been cast aside, but remains of key concern. These causes of action may well constitute important assets, the pursuit of which is at

_____

7. The Trustee, too, objected to lifting the freeze as to any of the allegedly
tainted funds in the A, B and D accounts. However, assuming that the
Trustee's argument in this regard would be similar to that of the SEC,
which filed a brief and argued before us, we see no merit in this
position.
It appears that the Trustee's position is based primarily upon the desire
to pursue causes of action against these allegedly tainted funds, but, as
we have indicated, we view that as an issue separate and apart from the
issue as to whether the court had power over these assets initially,
sufficient to justify the issuance of the ex parte order. The fact that
the
Trustee wants to have these assets under his control in order to claim
recovery from them does not constitute legal support for their continued
freeze pursuant to the initial ex parte order. We also note that no party
has argued that lifting the freeze would result in the dissipation or
removal of assets from the jurisdiction of the court. To the contrary, the
investors whose funds are in these accounts are school districts
presumably with ample funding, who are available to receive service of
process.

18

the very heart of these proceedings.8 In fact, we note and applaud the Bankruptcy Judge's concern for this issue as reflected in his refusal to dismiss the bankruptcy case, stating:

> We . . . find it advisable to permit these bankruptcy cases to proceed to determine whether they provide a better process for resolving issues left unresolved by the district court.

We read in these words an appropriate concern that assets are properly marshaled and distributions properly ordered in connection with a reorganization or liquidation of these debtors.

Appellants also object to the method of distribution of any funds released from the freeze. Appellants argue that the released funds should be divided pro rata among all categories of investors, as opposed to among only the A, B and D investors, and, more importantly, that the losses in the pooled account should be borne by all of defendants' clients, as opposed to just the C clients. Intervenors argue that the District Court's orders were proper, with the A, B and D investors getting back 100% of their principal, and the losses in the pooled account being divided pro rata among the C investors only. Since the District Court orders regarding the distribution of the released funds state clearly that they do "not constitute a final adjudication of any claims by or between investment advisory clients," and leave for another day the pursuit of claims against various holders of assets, which would in essence result in a redistribution of assets, the orders we have been asked to review do not constitute final rulings on asset distribution, and this issue, therefore, is not properly before us on this appeal.

In summary, the District Court's orders lifting the freeze as to the A, B and D accounts were based upon a sound legal footing.9 Further, in issuing these orders, it did not

_____

8. We express no opinion as to which forum is appropriate for this pursuit but assume that the best interests of all creditors and the Trustee's fulfillment of his fiduciary and statutory duties will guide the proceedings.

9. The fact that the court, although stating that it did not propose to address the freeze at that time, nonetheless sua sponte dissolved the

19

determine claims, foreclose pursuit of taints, or in any way resolve disputes or final distributions among the parties.

V. PROPRIETY OF THE PROCEDURAL ORDERS

Appellants also complain that the procedural orders entered by the District Court denied them discovery and prevented them from introducing evidence during the hearing which culminated in the orders lifting the freeze. The proceedings at issue spanned two days. A designated representative from each category of investors was permitted to raise objections to the modification of the freeze and was given a set amount of time for oral argument. In addition, a representative from each category of investors was allowed to cross-examine a designated witness regarding the Price Waterhouse accounting analysis, as well as the SEC official who oversaw the investigation of defendants, and was permitted to present testimony by way of an affidavit or expert report in support of any filed objections. Also, the legal position appellants urge, which was the position advanced by the Trustee and the SEC that assets subject to the alleged taints should remain subject to the freeze, had been fully briefed by the Trustee and the SEC prior to the time that the District Court issued its May 11 order lifting the freeze from these assets.

We note that where there is a receiver with equitable power in a proceeding before it, the District Court has wide discretion as to how to proceed. See Elliott, 953 F.2d at

_____

freeze as to the A, B and D accounts following the April 29 hearing regarding the Trustee's motion to modify the restraining order does not change this analysis. As discussed infra, the court has wide discretion in fashioning proceedings with regard to an equitable receivership. SEC v. Elliott, 953 F.2d 1560, 1566 (11th Cir. 1992) (noting court's wide discretion to determine relief in equity receivership), rev'd in part on other grounds, 998 F.2d 922 (11th Cir. 1993). Further, this issue had been fully briefed by the SEC and the Trustee, with the Trustee taking appellants' position that the court should not release these funds. Appellants have not argued how further factual development of this issue would have led to a different result since it had already been adequately developed.

20

1566 (noting court's wide discretion to determine relief in equity receivership); SEC v. Hardy, 803 F.2d 1034, 1040 (9th Cir. 1986) (noting that a court may use summary proceedings to determine relief in equity receivership). Appellants have failed to advance a theory or posit a relevant rule or case precedent that would have been the basis for continuing the freeze if they had not been thwarted in their effort to obtain the necessary proof. Even assuming that appellants had an arguable right to the procedural protections they seek, they have failed to show how they were prejudiced or harmed by the summary proceedings, since they have articulated no theory whereby a freeze could possibly have been appropriate as to the A, B or D funds. See Elliott, 953 F.2d at 1567 (stating that "appellants must show how they were prejudiced by the summary proceedings and how they would have been better able to defend their interests in a plenary proceeding"); Wencke, 783 F.2d at 837–38 (holding that summary proceedings are sufficient where party failed to show how he was prejudiced by such proceedings).

Again, the fact that appellants may wish to pursue a cause of action for recovery of taints, even under a common enterprise theory, does not constitute a basis for a freeze of assets ex parte at the behest of the SEC. Since legal action in pursuit of the taints is clearly contemplated in the receivership or the bankruptcy proceedings, no harm has been done by the court's implementation of certain procedures for the conduct of the April 29 hearing.

Accordingly, we find that the District Court did not abuse its discretion in conducting the hearing in the manner it did.

VI. CONCLUSION

For the reasons stated above, as pertaining to the freeze orders and the procedural orders, the District Court orders are affirmed. This appeal from the fee order is dismissed for lack of jurisdiction.

21

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit