**UNITED STATES COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**Nikolai Simon BATTOO et al., Defendants.**

**No. 12 C 07127**

United States District Court, N.D. Illinois, Eastern Division.

Signed September 4, 2014

Andrew Ridenour, United States Commodity Futures Trading Commission, Amanda Leigh Harding, David S. Slovick, Kathleen Banar, Commodity Futures Trading Commission, Washington, DC,

Carlin R. Metzger, United States Commodity Futures Trading Commission, Chicago, IL, for Plaintiff.

Anthony Vitullo, Fee, Smith, Sharp & Vitullo, LLP, Dallas, TX, for Plaintiff Don Buford, Jr.

James Arthur McGurk, Law Offices of James A. McGurk, P.C., Chicago, IL, for Movant Collette Guerra.

Deborah L. Thorne, Alison C. Conlon, Barnes & Thornburg, Anthony George Stamato, Kaye Scholer LLC, Emily L. Seymore, Eric H. Sussman, Paul Hastings LLP, Chicago, IL, Alexander S. Lorenzo, Alston & Bird LLP, New York, NY, Robert McPherson Spalding, Kaye Scholer LLP, Chicago, IL, Suzanne Novella Boyd, William S. Sugden, Alston & Bird LLP, Atlanta, GA, for Receiver.

Michael F. Cockson, Faegre Baker Daniels, Minneapolis, MN, Trina K. Taylor, Faegre Baker Daniels LLP, Chicago, IL, for Intervenor.

## ORDER

Honorable EDMOND E. CHANG, United States District Judge

As directed in the Court's February 6, 2014 Minute Entry [R. 256], Hadley Chilton and John Greenwood, in their capacity as Joint Liquidators (the "BVI Liquidators") of the BVI Funds,[1] have filed a motion to modify [R. 255] the Preliminary Injunction [R. 22]. For the reasons stated below, the BVI Liquidators' motion is denied.

## I. Background[2]

On September 27, 2012, the Court entered an order granting the Commodity

---

1. The BVI Funds refers collectively to Anchor Hedge Fund Limited ("Anchor"), Galaxy Fund, Inc. ("Galaxy"), FuturesOne Diversified Fund Limited ("FuturesOne Diversified"), FuturesOne Innovative Fund SPC Ltd. ("FuturesOne Innovative"), FuturesOne Class O Investments Ltd. ("FuturesOne Class O"), and Phi R (Squared) Master Series Investment Ltd. ("Phi R Master").

2. This Order assumes the reader's familiarity with the facts and proceedings in this case

Futures Trading Commission's (CFTC) motion for a preliminary injunction. R. 22, Prelim. Inj. To preserve the status quo, protect Defendants' alleged victims from further loss and damage, and to minimize the danger of further violations of the law by Defendants, the Court also appointed and authorized a Receiver to "[t]ake exclusive custody, control, and possession of all Receivership Assets and other funds, property, and assets of, in the possession of, or under the control of the Defendants...." *Id.* ¶¶ 41–42.

To date, the Receiver has seized the following assets from accounts in the names of various BVI Funds:

*The Whitebox Assets:* $1,169,713.37 in cash held by EFG Private Bank (Channel Islands) Limited in Guernsey, Channel Islands in accounts owned by Phi R Master. R. 255, BVI Liquidators' Mot. to Modify, Exh. A, BVI Compl. at 2.

*The Quantitative Assets:* $5,654,032.67 in cash held by EFG Private Bank (Channel Islands) Limited in Guernsey, Channel Islands in accounts owned by Phi R Master. *Id.*

*The Newedge Assets:* $8,812,871.06 in cash held by Newedge USA, LLC in accounts in the name of Phi R Master, FuturesOne Innovative, and Futures One Class O. *Id.* at 3. The Phi R Master account contained $2,750,155.44. R. 273–66, Kane Aff., Exh. 65. The FuturesOne Innovative accounts contained $1,689,602.12. R. 273, Kane Aff.

¶ 96. The FuturesOne Class O account contained $4,510,071.60. *Id.*

*The Reed Smith Assets:* $10,981,901.91 in proceeds from a litigation settlement held in a client trust account at the London law office of the law firm Reed Smith, LLP. BVI Compl. at 3. Reed Smith held the funds in the name of BC Capital Group Limited, which prosecuted the case on behalf of Anchor, Galaxy, and FuturesOne Diversified. BVI Compl. at 3.

On behalf of the BVI Funds, the BVI Liquidators now dispute whether these assets (for convenience's sake, the "Disputed Assets") were properly seized. *Id.* at 2.

## II. Analysis

Reduced to its essential terms, the Receiver's interest in the Disputed Assets derives from the following transactions: (1) Defendants invested Private International Wealth Management (PIWM) investor money with a broker/dealer called Alliance Investment Management, Ltd.;[3] (2) Alliance, in turn, invested that money in certain BVI Funds by buying shares of those funds—specifically, Alliance held 37.83% of Anchor's participating shares, 10.35% of Galaxy's participating shares, and 17.33% of FuturesOne Diversified's participating shares; and (3) the BVI Funds invested in (or, in the case of the Reed Smith assets, were entitled to) the Disputed Assets,[4] as described above. *Id.* at 9–53. From here, the parties disagree sharply as to what part of the Disputed

and sets forth only the background relevant to the BVI Liquidators' motion to modify the preliminary injunction.

3. Alliance is a Bahamian broker/dealer that shared telephone and facsimile numbers with Defendants BC Panama and BC Hong Kong. R. 272, CFTC Statement of Fact ¶¶ 8, 18. Defendant Battoo also subleased a section of office space from Alliance to use as BC Panama's and BC Hong Kong's offices. *Id.* ¶ 18.

And Battoo controlled Alliance's bank accounts. Kane Aff. ¶ 34. Thus, for the purposes of this Order, Alliance is treated as an alter-ego of Defendants.

4. Most commonly, the BVI Funds invested in the Disputed Assets through investments in (or money transfers to) Phi R Master, in whose name many of the Disputed Assets were held.

Assets are legitimately subject to receivership.

The BVI Liquidators contend that the Disputed Assets, in their entirety, should be turned over to the BVI Liquidators for liquidation. They argue that, as "distinct legal entities, organized in different jurisdictions, with separate investors, all of whom have separate investment expectations," the BC Capital Entities and the BVI Funds should not be treated interchangeably. *Id.* at 5. In the same vein, they contend that the BVI Funds' assets should not be pooled, in a "global fund," with the BC Capital Entities' assets for distribution to victims of Defendants' fraud. Instead, the Disputed Assets should be turned over to the BVI Liquidators, at which point the Receiver may make a claim to whatever distribution Alliance would be entitled to receive based on its ownership interests in certain BVI Funds. *Id.* at 2–3, 11.

The CFTC, in contrast, argues that the Disputed Assets in their entirety should remain Receivership Assets. It contends that Defendants so extensively commingled PIWM investor funds with BVI funds as to blur all distinction between them. R. 282, CFTC Response Br. at 12–14. Specifically, it argues that PIWM and BVI funds were commingled when Alliance invested in and received purported returns from the BVI Funds, and were further commingled through *intra* fund transfers between certain share classes within the BVI Funds, and *inter* fund transfers amongst the BVI Funds themselves. *Id.*; R. 272, CFTC Statement of Fact ¶ 43. As a result, the CFTC argues that "all of the Disputed Assets are tainted by Defendants' fraud and must be distributed to all victims of the fraud on a *pro rata* basis." CFTC Response Br. at 14.

In its brief, the CFTC makes five arguments as to why the BVI Liquidators' motion to modify should be denied: (1) the Disputed Assets are Receivership Assets under the preliminary injunction and the Court's order directing turnover of the Whitebox Assets; (2) the motion to modify the preliminary injunction is procedurally defective; (3) the BVI Liquidators have not provided any evidence or legal authority to support their motion; (4) the CFTC and the Receiver have presented substantial evidence and legal authority to preserve the current scope of the injunction; and (5) maintaining the preliminary injunction in its current form is in the public interest. The CFTC's second argument, regarding the procedural soundness of the BVI Liquidators' motion, is insubstantial and a footnote is enough to explain why.[5] The remaining arguments are addressed in turn.

---

5. The CFTC argues that the BVI Liquidators' motion is procedurally defective in two ways: (1) the motion is styled as a complaint for declaratory relief, and (2) the motion is untimely and substantively lacking under Rule 59(e) and Rule 60(b). CFTC Response Br. at 7. The Court rejects both arguments. The motion is styled in precisely the way the Court directed at the February 6, 2014 status hearing. *See* R. 285, February 6, 2014 Hr'g Tr. Because the proposed complaint thoroughly set forth the BVI Liquidators' arguments regarding the Disputed Assets (and to spare the expense of drafting a duplicative motion), the Court directed the BVI Liquidators to file the motion as-is. *Id.* at 16:24–17:16. In response, the CFTC stated, "We are happy to respond to their complaint as determined to be a motion." *Id.* at 20:13–14. As for the timeliness of the motion, a preliminary injunction is not a final judgment or final order. Thus, the time limits imposed by Rules 59(e) and 60(b) do not apply. Lastly, because the motion to modify was presented as a complaint (as approved by the Court), the BVI Liquidators' reply was appropriately more fulsome than usual. So their motion for excess pages [302] is granted, and the CFTC's motion to strike [322] is denied.

## A. The Preliminary Injunction and Whitebox Turnover Order

The CFTC argues that, in addition to Alliance's ownership interest in the Disputed Assets via investment in the BVI Funds, the Disputed Assets are also properly Receivership Assets as a function of Battoo's control over them. It is undisputed that Battoo acted as an "investment advisor" or "senior investment advisor" to each of the BVI Funds, giving him discretionary authority to invest each Fund's assets. BVI Compl. ¶¶ 37 (Anchor), 84 (Galaxy), 135 (FuturesOne Diversified), 183 (FuturesOne Innovative), 218 (Phi R Master). In fact, the record shows that Battoo was the *only* one who could make investment decisions on behalf of each Fund. CFTC Statement of Fact ¶¶ 66 (Anchor); 80 (FuturesOne Diversified); 93 (FuturesOne Innovative); 103–05 (Galaxy); 124 (Phi R Master). And, in addition to holding an advisory position with each Fund, Battoo also controlled the voting shares of each Fund. *See id.* ¶¶ 63 (Anchor); 76 (FuturesOne Diversified); 89 (FuturesOne Innovative); 103 (Galaxy); 122 (Phi R Master). In light of the many facets of Battoo's control over the BVI Funds, the CFTC contends that the Disputed Assets should fall under the preliminary injunction's freeze over all "assets directly or indirectly owned, beneficially or otherwise, managed or controlled by the Defendants, whether held in their own names or in the names of others ('Receivership Assets')." Prelim. Inj. ¶¶ 36, 41.

The parties have already exchanged a preliminary round of arguments on this issue: in August 2013, the Receiver filed a motion to compel turnover of the Whitebox Assets (funds held in an EFG account owned by Phi R Master), based on Battoo's control over Phi R Master. R. 185, Whitebox Turnover Mot. ¶¶ 15, 17. The BVI Liquidators did not oppose the turn-

over at that time, but noted their concern that "the majority, if not all of those assets in the fund, belong to investors who had nothing to do with Battoo." R. 239, August 15, 2013 Hr'g Tr. at 6:22–24. The Court granted the Receiver's motion for turnover of the Whitebox Assets, subject to the BVI Liquidators' reservation of rights before the distribution phase. *Id.* at 10:9; 16:23–24.

With regard to the present motion, the CFTC argues that "[a]ll of the Disputed Assets are similarly situated to the Whitebox Assets" in terms of Battoo's control over them, and thus "all of the other Disputed Assets are Receivership Assets under the Preliminary Injunction in its current form." CFTC Response Br. at 6. The BVI Liquidators argue, in response, that their appointment extinguished Battoo's control over the BVI Funds. R. 305, BVI Reply Br. at 3. Accordingly, they contend that the freeze over those assets should be lifted because the assets are no longer "managed or controlled" by Battoo. *Id.*

To a limited extent, the BVI Liquidators are correct: Battoo's removal from a position of authority over the BVI Funds alleviates concerns regarding the "withdrawal or misapplication of funds entrusted to the Defendants." Prelim. Inj. ¶ 42(D). But the extent of Battoo's prior control over the BVI Funds also explains why the BVI Liquidators are wrong in arguing that the BVI Funds are entirely distinct from the BC Capital Entities: regardless of who owned the Funds, the fact remains that Battoo could—and did—control them, including having the ability to move assets between and within Funds in furtherance of his fraudulent scheme.

For this reason, the BVI Liquidators' reliance on *SEC v. Black*, 163 F.3d 188 (3d Cir.1998), is unavailing. In *Black*, the Third Circuit affirmed a district court's

decision to modify a preliminary injunction involving four classes of investors in a fraud case: Classes A, B, C, and D. *Id.* at 191–94. The district court determined that Class C was a pool of investor funds used to pay distributions to investors in Classes A, B, and D. *Id.* Ultimately, the district court lifted the freeze over Classes A, B, and D because it determined that the Defendants did not have control over those funds. *Id.* at 196 (internal quotation marks omitted). The BVI Liquidators acknowledge that implicit in the Third Circuit's holding "is the idea that there exists a level of control over third party assets that can permit a court to freeze the funds." BVI Reply Br. at 9. But they argue that such a level of control is not present here. *Id.* The record shows otherwise. As stated (and cited) above, the record proves that Battoo had discretion— likely the sole discretion—on how to invest the BVI Funds' assets. And, as the Court will discuss in more detail below, Battoo exercised that control repeatedly in furtherance of his fraudulent scheme and to his own personal benefit.

In short, the Court agrees with the CFTC that the Disputed Assets are all similarly situated to the Whitebox Assets and properly subject to the asset freeze. The remaining question is what *portion* of the Disputed Assets should be subject to the freeze, which is discussed below.

## B. Evidence and Legal Authority

 The CFTC argues that the Disputed Assets in their entirety should remain Receivership Assets because (1) the BVI Liquidators have failed to provide any legal or evidentiary justification to modify the preliminary injunction, whereas (2) the CFTC has provided ample justification to preserve the status quo. That is not entirely right: the BVI Liquidators have convincingly established that the Alliance investors represent only a subset (and possibly a small one) of claimants to the Disputed Assets. Under either party's approach to distribution, that fact will ultimately limit the CFTC's recovery to Alliance's proportional interest in the BVI Funds. In the meantime, however, the question is how to treat the Disputed Assets until the funds are distributed.

Ideally, the Court could direct the Receiver to retain only Alliance's share of the Disputed Assets and to turn over the remainder to the BVI Liquidators. But there comes a point where funds are so extensively commingled that a court cannot reasonably attempt to segregate legitimate funds from illegitimate funds. Restatement (Third) of Restitution & Unjust Enrichment § 59 cmt. a (2011). Past that point, if a recoverable asset is insufficient to fully repay investors, the entire "tainted" asset is subject to receivership and pro rata distribution. *SEC v. Wealth Mgmt. LLC,* 628 F.3d 323, 333 (7th Cir.2010).

Here, the recoverable assets are insufficient to fully repay investors: Defendants' net exposure of $36.5 million [6] exceeds the Disputed Assets' collective value of $26.6 million. This is an important point because, if the Disputed Assets *exceeded* Defendants' net exposure, the Court could simply release whatever disputed funds were in excess of that figure. The BVI Liquidators argue that, combined with other Receivership Assets, the sum total of the assets seized by the Receiver (both here and in Guernsey) would exceed Defendants' net exposure by nearly $20 million, resulting in a windfall to the receivership. BVI Reply Br. at 3–4. But that

---

**6.** The BVI Liquidators arrive at this figure by calculating "cash invested into the BVI Funds by the CFTC Defendants less redemptions made by the CFTC Defendants from the BVI Funds." BVI Reply Br. at 4 n. 4; *see also* Kane Aff. ¶ 43.

argument relies, for right now, on speculation. The future disposition of the Guernsey assets is uncertain, because litigation over those assets is ongoing. R. 329–1, Guernsey Litigation Judgment (the Guernsey Court's opinion is referred to as a "judgment," but it is not a final one). And, in any event, the current motion concerns only a *freeze* over the Disputed Assets; no party will receive any portion of the Disputed Assets—much less a windfall—until the Assets' *distribution*.[7] To be sure, at prior hearings and in prior filings in this case, the Receiver and the CFTC seemed to take the position that any Battoo-directed investment of victim moneys in a fund would entitle the CFTC and the Receiver to distribute *all* of the fund to Battoo's victims, even if the fund exceeded the victims' investment in it. But that is clearly no longer the CFTC or the Receiver's position.

What does make the BVI Funds subject to pro rata distribution is the evidence of extensive commingling. After investing over $80 million of Alliance funds in shares of certain BVI Funds, Battoo transferred money constantly between Funds and within Funds (that is, between share classes within a given Fund). CFTC Statement of Fact ¶¶ 31, 43. During the relevant time period, Battoo made over 800 transfers between BVI Funds' accounts. *Id.* ¶ 33. The following transac-

tions, made over the course of a few weeks, illustrate just a fraction of the intrafund and interfund commingling:

- In early 2008, Alliance received $4,264,644.27 in PIWM investor funds from Ocean Park Int'l Ltd. (AG), Maven Assurance (B), and Maven Assurance (C). R. 273–24, Exh. 23 at 3–6.

- After Alliance received the PIWM funds, Alliance transferred $2,400,300 to Anchor (Classes B, C, and E), $1,150,100 to FuturesOne Diversified (Class A), and $100,100 to Galaxy (Class G). *Id.* at 12.

- A few days later, Anchor Class B transferred $500,550 to Anchor Class A, $500,550 to Anchor Class C, and $500,550 to FuturesOne Diversified Class A.R. 273–25, Exh. 24 at 4.

- Around the same time, Anchor Class E transferred $741,900 to Anchor Class A and $741,900 to FuturesOne Diversified Class A.R. 273–27, Exh. 26 at 5.

- The same week, FuturesOne Diversified Class A transferred $2,000,000 to FuturesOne Diversified Class B.R. 273–28, Exh. 27 at 3.

In all, the Receiver identified 842 transfers within and amongst Funds during the relevant time period, summarized in the following chart:

---

7. For this reason, the BVI Liquidators' reliance on *SEC v. Malek* and *CFTC v. Eustace* is not currently instructive. *See SEC v. Malek,* 397 Fed.Appx. 711 (2d Cir.2010) (reviewing district court's plan to liquidate and distribute assets of a Ponzi scheme); *CFTC v. Eustace,* No. 05–2973, 2008 WL 471574 (E.D.Penn. Feb. 19, 2008) (reviewing receiver's distribution plan).

| Fund | Number of Transactions | Type | Receipts | Payments | Net |
|---|---|---|---|---|---|
| Anchor Fund | 36 | Inter-Fund | $ 13,585,335 | $ (17,244,539) | $ (3,659,204) |
| Diversified Fund | 29 | Inter-Fund | 12,048,500 | (15,354,609) | (3,306,109) |
| Diversified Investment | 6 | Inter-Fund | - | (1,447,047) | (1,447,047) |
| Diversified SPC | 30 | Inter-Fund | 7,428,251 | (3,762,538) | 3,665,713 |
| Innovative SPC | 26 | Inter-Fund | 3,539,263 | (6,100,948) | (2,561,685) |
| Galaxy Fund | 37 | Inter-Fund | 29,039,072 | (9,934,380) | 19,104,692 |
| Phi R (Squared) Master | 18 | Inter-Fund | 13,798,037 | (2,050,000) | 11,748,037 |
| Subtotal | 182 | | $ 79,438,458 | $ (55,894,061) | $ 23,544,397 |
| | | | | | |
| Anchor Fund | 304 | Intra-Fund | $ 10,525,129 | $ (22,574,595) | $(12,049,466) |
| Diversified Fund | 229 | Intra-Fund | 3,773,570 | (3,763,485) | 10,085 |
| Innovative SPC | 36 | Intra-Fund | 46,646 | (46,646) | - |
| Galaxy Fund | 73 | Intra-Fund | 4,993,784 | (5,372,617) | (378,833) |
| Phi R (Squared) Master | 18 | Intra-Fund | 309,342 | (309,342) | - |
| Subtotal | 660 | | $ 19,648,471 | $ (32,066,685) | $(12,418,214) |
| Totals | 842 | | $ 99,086,929 | $ (87,960,746) | $ 11,126,183 |

Against the backdrop of this intrafund and interfund commingling, Battoo transferred about $13.5 million from other BVI Funds into an account held by Phi R Master—the BVI Fund that ultimately acquired most of the Disputed Assets. Kane Aff. ¶ 71. Specifically, Phi R Master received $248,037.20 from Anchor, $7,500,000 from Galaxy, $2,000,000 from FuturesOne Diversified, and $1,600,000 from FuturesOne Innovative. R. 273–50, Exh. 49 at 2. Thus, it is likely that PIWM investor money flowed from Alliance to the three investment Funds, from one class to another within each investment Fund, from each investment Fund to other BVI Funds, and finally from the Funds' collective investments in the Phi R Master account to the Disputed Assets.[8]

The BVI Liquidators argue that these transfers were not wrongful commingling, but rather lawful investments. BVI Reply Br. at 38–39. But, even if that were true, it would be a distinction without a difference. Regardless of intent, the fact remains that, after so many "investments" (if that is what they really were) between and within BVI Funds, it is impossible at this stage to calculate—much less carve out—any one investor's share. For these reasons, the authority and the evidence presented by the CFTC support denial of the BVI Liquidators' motion.

### C. Public Interest

■ The CFTC's final argument is that maintaining the preliminary injunction in its current form will serve the public interest. The Court agrees. The BVI Liquidators are concerned that maintaining the preliminary injunction in its current form will disadvantage the non-PIWM investors

---

8. Part of the Disputed Assets were held in a Newedge account owned by Futures One Class O. FuturesOne Class O does not appear among the highlighted transactions because it was only recently identified as a BVI Fund by the BVI Liquidators. See R. 340, Class O Supplement. The BVI Liquidators argue that "neither Alliance nor any of the CFTC Defendants hold any interest" in FuturesOne Class O or FuturesOne Innovative Fund SPC (FuturesOne Class O's sole shareholder). Id. But FuturesOne Class O was also controlled by Battoo. R. 342, CFTC Response to Supplement ¶¶ 2–4. And the transaction history of FuturesOne Class O's account at EFG Bank makes clear that it, too, played a role in the extensive commingling detailed above. See R. 342-1, Exh. 8. For example, FuturesOne Class O made numerous payments to Alliance and to FuturesOne Diversified. Id. Accordingly, the Newedge Assets held in a FuturesOne Class O account are also properly receivership assets.

in the Disputed Assets. *See* BVI Reply Br. at 2 (arguing that CFTC aims to take "*all* of the BVI Funds' assets, increasing their recovery at the expense of other investors in the BVI Funds"). But, as noted above, that is an issue for the *distribution* phase. At this early stage, all investors in the Disputed Assets—both PIWM and non-PIWM—will receive notice of the BVI Funds' liquidations and invitations to file claims. And when the time comes to distribute the Disputed Assets, all claimants will be entitled to their pro rata shares.

Under these circumstances, there is no reason to believe that allowing the Receiver to facilitate the distribution, instead of the BVI Liquidators, will disserve any claimant. In light of Battoo's control over and mismanagement of the BVI Funds, *all* investors in those Funds can be characterized as victims of Defendants' fraud and, therefore, the intended beneficiaries of the CFTC's suit.

### III. Conclusion

For all of the reasons stated, the BVI Liquidators' motion to modify the preliminary injunction [R. 255] is denied. For the next step in the litigation, the CFTC and the Receiver shall propose a new schedule for the claims-process to begin, using the revised notice previously entered on the docket, R. 288. The next status hearing is on September 22, 2014, so the proposed schedule shall be filed on the docket by September 15, 2014.