**SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,**

**Stephenson Equity, Co., Intervenor–Plaintiff–Appellant,**

Robert Praegitzer, et al., Intervenors–
Plaintiffs–Appellees,

v.

CREDIT BANCORP, LTD., et al.,
Defendants–Intervenors–
Defendants,

Carl H. Loewenson, Jr.,
Receiver–Appellee.

Docket No. 00–6376.

United States Court of Appeals,
Second Circuit.

Argued: Oct. 11, 2001.

Decided: May 9, 2002.

Donald L. Kahl, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK (T. Lane Wilson, Tulsa, OK; William A. Maher, Frederick R. Kessler, Daniel S. Goldsmith, Wollmuth Maher & Deutsch, LLP, New York, N.Y. on the brief), for Intervenor–Plaintiff–Appellant.

Carl H. Loewenson, Jr., Morrison & Foerster, LLP, New York, N.Y. (Charles L. Kerr, Oliver Metzger, Andrew J. Fields, Eleonore Dailly, New York, N.Y., on the brief), for Receiver–Appellee.

Tom Karr, Securities and Exchange Commission, Washington, D.C. (David M. Becker, Gen. Counsel, Richard M. Humes, Assoc. Gen. Counsel, Melinda Hardy, Asst. Gen. Counsel, Meyer Eisenberg, Deputy Gen. Counsel, Washington, D.C., on the brief), for Plaintiff–Appellee.

Joel W. Sternman, Rosenman & Colin LLP, New York, N.Y.; Joel A. Mullin, Stoel Rives LLP, Portland, OR, submitted a brief for Intervenors–Plaintiffs–Appellees Robert Praegitzer, et al.

Before WALKER, Chief Judge, JON O. NEWMAN, and KEARSE, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

The issue on this appeal is whether shares of stock transferred to a company that defrauded the transferor and numerous other victims can be included in the receivership estate of the defrauding company for purposes of a *pro rata* distribution to the defrauded victims. Stephenson Equity Company ("SECO") appeals from opinions and orders of the District Court for the Southern District of New York (Robert W. Sweet, District Judge), dated November 29, 2000, and January 19, 2001, the combined effect of which approved a distribution plan in the receivership of Credit Bancorp, Ltd. ("CBL") and modified an injunction freezing CBL's assets. *SEC v. Credit Bancorp, Ltd.*, No. 99 CIV. 11395–RWS, 2000 WL 1752979 (S.D.N.Y. Nov.29, 2000) ("*Credit Bancorp (Plan) I*"); *SEC v. Credit Bancorp, Ltd.*, 129 F.Supp.2d 259 (S.D.N.Y.2001) ("*Credit Bancorp (Plan) II*").[1] We conclude that a

---

1. For prior opinions of the District Court, see *SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 457

*pro rata* distribution was within the equitable discretion of the District Court, and we therefore affirm.

### Background

SECO is a partnership substantially owned and controlled by Charles C. Stephenson, Jr. Stephenson is also founder and chairman of the board of Vintage Petroleum, Incorporated ("Vintage Petroleum"), a publicly traded oil and gas company. In March 1999, an agent of CBL contacted Stephenson to solicit SECO's participation in CBL's "insured credit facility program." Under this program, investors transferred cash or securities to CBL and received a promise of a quarterly dividend based on the value of the unencumbered assets transferred by the investor. The assets were to be used as collateral in the event that the investor drew upon a line of credit offered by CBL. The assets also served an additional purpose: in order to generate revenue from what CBL called " 'riskless' arbitrage transactions" with European banks,[2] CBL reflected the assets off its normal balance sheet, and the shares transferred by the investors into CBL accounts increased the amount of off-balance sheet assets available to generate the " 'riskless' arbitrage transactions."[3] CBL implied that it would be able to pay the investors their promised dividends from the profits earned on the arbitrage transactions. In reality, CBL, running a classic Ponzi scheme, paid investors a return out of the assets transferred by later investors.

*The SECO CFA and the SECO TEL.* The principal documents executed in contemplation of the asset transfer were the "CBL Credit Facility Agreement" ("SECO CFA") and what the parties refer to as the "Trustee Engagement Letter" ("SECO TEL"). The SECO CFA was executed on June 22, 1999, by Stephenson, as general partner of SECO, Richard Blech, as President and CEO of CBL, Douglas C. Brandon, as Trustee, and J. Frederick Storaska, president of Corporate Executive Services, Inc., the managing general partner of SECO. It contemplated the transfer of eight million shares of SECO's Vintage Petroleum stock and a quarterly dividend to SECO of 1.25 percent of the value of the unencumbered assets. The SECO TEL was executed the same day by Blech, Brandon, and Storaska. The SECO TEL incorporated the terms of the SECO CFA.

According to the SECO CFA, "CBL will engage Douglas C. Brandon ... to act as Trustee, to hold the Assets [the eight million Vintage Petroleum shares] ... in a

---

(S.D.N.Y.2000); *SEC v. Credit Bancorp, Ltd.,* 93 F.Supp.2d 475 (S.D.N.Y.2000); *SEC v. Credit Bancorp, Ltd.,* 96 F.Supp.2d 357 (S.D.N.Y.2000); *SEC v. Credit Bancorp, Ltd.,* 103 F.Supp.2d 223 (S.D.N.Y.2000); *SEC v. Credit Bancorp, Ltd.,* 109 F.Supp.2d 142 (S.D.N.Y.2000); *SEC v. Credit Bancorp, Ltd.,* 194 F.R.D. 469 (S.D.N.Y.2000); *SEC v. Credit Bancorp, Ltd.,* No. 99 Civ. 11395(RWS), 2000 WL 968010 (S.D.N.Y. Aug.8, 2000); *SEC v. Credit Bancorp, Ltd.,* No. 99 Civ. 11395(RWS), 2000 WL 1170136 (S.D.N.Y. Aug.16, 2000); *SEC v. Credit Bancorp, Ltd.,* 124 F.Supp.2d 824 (S.D.N.Y.2000).

2. The quoted phrase is from a CBL promotional document entitled "THE CBL IN-

SURED CREDIT FACILITY," obtained by the Receiver from SECO's files, and attached as an exhibit to the Receiver's June 28, 2000, Declaration to the District Court.

3. As explained in CBL's promotional materials, "Credit Bancorp has established private banking relationships with many of the largest banks in the world, most of which have branch offices in Geneva or Zurich," "[t]hese Swiss banks grant Credit Bancorp an off-balance sheet trading line of credit, which on average will be about five times the value of the unencumbered assets placed on deposit with a major New York bank (or brokerage firm)," and "[t]he Swiss bank[ ] ... can only execute 'riskless' arbitrage transactions."

CBL account for the benefit of SECO and CBL." SECO CFA, ¶ 1.1; *id.* ¶ 2.1. SECO "will deliver to Trustee the specified fungible Assets ... to serve as collateral for the credit facility" and to be held by United States brokerage firms "for the Credit Bancorp Ltd. account." *Id.* ¶ 2.3. Under the same paragraph, however, "CBL ... retains the sole right to transfer some or all of the Assets to other Accounts...." *Id.*

"[B]eneficial ownership to the Assets shall at all times remain with SECO," *id.,* ¶ 4.1, and "CBL and Trustee represent and warrant that the Trustee shall have legal title to the Assets and that SECO shall retain equitable title and beneficial ownership at all times, including following the deposit of the Assets into the Account, and that the Assets remain an asset of SECO and do not become an asset of CBL," *id.* ¶ 4.2.

The SECO TEL provides in relevant part:

I [Brandon] am the signing attorney-in-fact for all CBL Trustee accounts. These [Vintage] securities are to be held by me in a CBL account and may not be sold, pledged, assigned, margined, liened, hypothecated, or otherwise disposed of except as provided for in the CFA.... At no time am I to release the securities to any third party. As the securities are being delivered solely as collateral for any advance SECO may obtain under the credit facility with CBL, beneficial ownership is retained by SECO.

*SECO's transfer of shares into CBL accounts.* As described above, the SECO CFA provided that SECO would "deliver *to Trustee* the specified fungible Assets." ¶ 2.3 (Emphasis added). However, in a letter dated June 21, 1999, Stephenson authorized SECO's brokerage firm, Merrill Lynch, to transfer eight million shares of

Vintage Petroleum into four separate CBL accounts, none of which was identified as a trust account. The first, at Alex Brown and Sons, is a CBL account identified by account number only. The second and fourth accounts, at Swiss American Securities, Inc. and Brown Brothers Harriman, respectively, are described as "FFC: [for further credit of] Credit Bancorp." The third account, with National Financial Services, is described as "FBO: [for benefit of] Credit Bancorp."

In early July 1999, CBL began transferring the Vintage shares out of the first group of accounts and into a variety of its other accounts at financial institutions such as Ameritrade, Charles Schwab, Chase Investment, and Credit Suisse Private Banking. None of these accounts was identified as a trust account. In both the first and subsequent groups of accounts, the investors' assets, including SECO's, were commingled with the assets of CBL's other investors.

*CBL's fraudulent activity.* CBL was operational from some time in 1997 until November 17, 1999, when the SEC filed suit and obtained a TRO freezing the assets of CBL and its related entities. By that time, CBL had victimized more than 200 investors. Most investors had transferred assets to CBL as contemplated by CFA and TEL agreements similar to those executed by SECO. Approximately 93 investors—referred to in this litigation as "the Bob Mann customers"—directed their deposits of cash and mutual funds under advice from Advisor's Capital Investments into the CBL "Insured Securities Strategy" program.

Contrary to its claims that it was engaging in "riskless" arbitrage, CBL's only material source of revenue was the deposit of cash and securities by its investors. CBL's primary business, other than attracting new investors, was to engage in

currency futures and options trading that led to substantial losses. CBL financed its trading with cash and securities taken directly from its accounts and with money borrowed by pledging deposited securities as collateral for margin loans. CBL has encumbered a substantial portion of the securities deposited by customers, including a majority of the Vintage Petroleum shares, to secure its margin loans. CBL also used its investors' funds to pay the cash "dividends" to its investors, such as the dividends paid to SECO approximating $1.26 million dollars.

CBL shifted funds and securities regularly among brokerage accounts, and neither segregated customer deposits nor earmarked a particular customer's deposited assets to be used to pay that customer's custodial dividend. SECO's claim is distinguishable from that of many of CBL's customers only in that the eight million Vintage Petroleum shares it deposited were not converted to cash and are currently being held in CBL's brokerage accounts.[4]

*The proposed plans of distribution and the District Court's approval.* The District Court appointed a receiver, Carl H. Loewenson, Jr. ("the Receiver") to marshal CBL's assets and to prepare a distribution plan. Interim distribution plans were proposed by the Receiver, the SEC, and certain CBL customers as intervenors—SECO and Dr. Gene Ray (collectively the "SECO Intervenors") and Thomas Stappas *et al.* (the "Stappas Intervenors").[5] Under SECO's proposed plan, those CBL clients, like SECO, who had executed CFAs, would be given priority over clients who had deposited cash directly into CBL accounts. Under the SEC's plan, the Receiver would liquidate all of CBL's assets—including the Vintage Petroleum shares in CBL's accounts—and distribute the resulting cash on a *pro rata* basis, based on the amounts of initial investments.

The Receiver's proposed plan ("the Compromise Plan") was designed to achieve the SEC's objective that all investors benefit from the distribution on a *pro rata* basis (according to the amount of their investments) and also meet SECO's preference that the Vintage Petroleum shares not be liquidated.[6] Under the

---

**4.** The SECO Intervenors are the only parties to have made a formal motion for recovery of their securities. Some of CBL's other customers, however, have made similar claims pursuant to comments regarding the proposed plans for partial distribution. *See, e.g.,* Letter from Karla G. Sanchez, Patterson, Belknap, Webb & Tyler on behalf of Compositech, Ltd. of June 28, 2000 (adopting SECO Intervenors' arguments in support of claim that Compositech should be entitled to trace the shares it deposited with Credit Bancorp); Letter from James Wesley Kinnear on behalf of John Dillon to the Court of July 14, 2000 (same).

**5.** The various plans are described in detail by the District Court. *See Credit Bancorp (Plan) I,* 2000 WL 1752979, at *29–47.

**6.** The SEC and Intervenor–Plaintiff–Appellee Robert Praegitzer have submitted briefs *amici*

*curiae* on this appeal stating their acceptance of the District Court's choice of distribution plan. Praegitzer transferred shares into CBL accounts according to an agreement closely similar to the one executed by SECO. Pursuant to an agreement among Praegitzer, the SEC, and the Receiver (at the time, under the title of "Fiscal Agent"), the Receiver tendered Praegitzer's shares and deposited the cash proceeds into the accounts that had held the stock. In defiance of a Freeze Order imposed by the SEC, the depository institutions seized the proceeds of the sale of Praegitzer's stocks, and applied them to pay down CBL's margin loans.

The District Court ordered that in any plan of distribution Praegitzer was entitled to be treated as if the depository institutions had not seized the proceeds of its assets. Praegitzer alleged that, under the Compromise Plan, he will receive less than if the proceeds of his

Compromise Plan, the Vintage Petroleum shares are returned to SECO, but SECO is required to pay into the receivership estate a cash "undertaking" determined primarily from a percentage of the value of the shares (the percentage reflecting the portion of all victims' investments that were lost). The cash undertaking will be included in the receivership estate for purposes of the *pro rata* distribution.[7]

In a comprehensive Order and Opinion dated November 29, 2000, the District Court approved the Compromise Plan, *Credit Bancorp (Plan) I*, 2000 WL 1752979, at *48, and, acting on the Receiver's request, in an Opinion dated January 19, 2001, amended the Compromise Plan, *Credit Bancorp (Plan) II*, 129 F.Supp.2d at 263. Also on January 19, 2001, the Court entered an Order directing the Receiver, among other things, to "use his best judgment to effectuate" the Compromise Plan. SECO filed a notice of appeal from the Order and Opinion dated November 29, 2000, and an amended notice of appeal from the November 29, 2000, Order and Opinion, the January 19, 2001 Opinion, and the January 19, 2001, Order.[8]

### Discussion

### I. Jurisdiction

 SECO, in its appeal, and the Receiver, in opposition, primarily join issue on whether the District Court's confirmation of the Compromise Plan was within the Court's equitable authority. The Court resolved that issue in the Receiver's favor both in approving the Compromise Plan and in denying SECO's motion for partial summary judgment to obtain return of the Vintage shares. The latter ruling is not independently appealable, and the former ruling ordinarily is not independently appealable unless the doctrine of "practical finality," *see* 19 *Moore's Federal Practice* § 202.08 (3d ed.2001), or the collateral order doctrine, *see SEC v. Forex Asset Management LLC*, 242 F.3d 325, 330 (5th Cir.2001) (applying collateral order doctrine to approval of receiver's distribution plan), applies. *See also SEC v. Elliott*, 953 F.2d 1560 (11th Cir.1992) (exercising appellate jurisdiction over order establishing final plan of distribution, without explicit discussion of jurisdiction). We need not consider either doctrine, however, because the effect of the District Court's ruling was a modification of the freeze order that had been initially entered as a TRO and continued as a preliminary injunction, and "[i]nterlocutory orders of the district courts ... modifying ... injunctions" are appealable. 28 U.S.C. § 1292(a)(1). Appellate review under section 1292(a)(1), moreover, extends to " 'all

---

shares had not been seized. The District Court considered and rejected Praegitzer's objections to the Compromise Plan. *Credit Bancorp (Plan) I*, 2000 WL 1752979, at *44–46.· Praegitzer has not appealed.

7. The District Court estimated the current market value of all customer claims based on deposits of securities, defined as the number of shares deposited minus the total number of shares returned prior to the asset freeze, at approximately $265 million. *Credit Bancorp (Plan) I*, 2000 WL 1752979, at *11. The Court estimated the value of the claims based on cash deposits by the 93 "Bob Mann" customers at $10 million. *Id.* The ·outstanding margin loans on various brokerage accounts

totaled approximately $30 million. SECO estimated the current market value of the eight million Vintage Petroleum shares on July 6, 2001, at $150 million.

8. SECO contends that it is also appealing the District Court's Order dated May 16, 2001, which, among other things, implemented an Opinion dated April 6, 2001, adjudicating tax issues. However, neither SECO's original nor its amended notice of appeal refers to the District Court's May 16, 2001, Order or its April 6, 2001, Opinion. The tax issues are the subject of a separate appeal taken by the United States in No. 01–6158.

matters inextricably bound up with the [preliminary injunction],' " including, in this case, SECO's motion for partial summary judgment. *SEC v. Black,* 163 F.3d 188, 194 (3d Cir.1998) (quoting *Energy Action Educational Foundation v. Andrus,* 654 F.2d 735, 745 n. 54 (D.C.Cir.1980)) (alterations in original).

## II. Standard of Review

 We review the District Court's application of law with regard to its denial of SECO's motion for partial summary judgment *de novo. Black,* 163 F.3d at 195 (citing *AT & T v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir. 1994)). We review the District Court's decision relating to the choice of distribution plan for the receivership estate for abuse of discretion. *See SEC v. Fischbach Corp.,* 133 F.3d 170, 175 (2d Cir.1997); *SEC v. Wang,* 944 F.2d 80, 85 (2d Cir. 1991).

## III. The Ownership Interest in the Vintage Petroleum Shares

 SECO contends that CBL never obtained an ownership interest in the Vintage Petroleum shares and, therefore, that including the shares (or cash paid in to represent their value) in the receivership estate violates various provisions of state law. SECO asserts that the SECO CFA and TEL created an express trust, whereby legal title was transferred to the Trustee, with SECO retaining a beneficial interest. SECO contends that CBL's only interest in the transferred shares was a security interest contingent upon SECO's availing itself of the line of credit offered by CBL. Because SECO never drew upon the line of credit, the argument continues,

CBL never acquired a security interest or any other ownership interest.

If SECO's shares had been transferred pursuant to an express trust, we would confront the issue of whether the equitable interests of the settlor of an *inter vivos* trust may be adjusted by a *pro rata* distribution ordered by a district court, exercising its equitable jurisdiction in an SEC-initiated receivership proceeding, to remedy fraud perpetrated upon the settlor and other victims. We need not resolve that issue, however, because, although CBL solicited investments with documents indicating in some respects the anticipated use of a trust arrangement, the documents knowingly executed by SECO to transfer its Vintage shares in fact and in law accomplished an outright transfer of share ownership from SECO to CBL.

The documentation preparatory to the transfer of assets from SECO to CBL indicated that a trust arrangement was contemplated, yet also included provisions inconsistent with a trust. For example, consistent with a trust arrangement, a trustee was designated, SECO was expected to deliver the Vintage shares to the trustee, the trustee was to hold the shares in a CBL account over which he had signing authority,[9] and the trustee was not to release the shares to any third party. On the other hand, inconsistent with a trust arrangement, CBL retained the right to transfer the assets out of the initial account(s) into which they were transferred. *See Restatement (Second) of Trusts* § 175 (1959) ("The trustee is under a duty to the beneficiary to take reasonable steps to take and keep control of the trust property"); *id.* cmt. f ("The duty of the trustee is not only to take and keep control, but to take and keep exclusive control.").

9. In the SECO TEL, Brandon represented that he had signing authority for "all CBL trustee accounts," but in the very next sentence asserted that the transferred assets would be held "in a CBL account."

The documents accomplishing the transfer of assets are entirely inconsistent with a trust arrangement. None of the transfer documents executed by SECO required the shares to be transferred into trust accounts, and in fact the shares were not transferred into trust accounts. *See id.* cmt. c ("Where securities are held in trust the trustee is under a duty to take and keep possession of the securities, and to earmark them as trust property."). It is undisputed that on June 21, 1999, SECO authorized its broker, Merrill Lynch, to transfer the eight million Vintage Petroleum shares into three CBL brokerage accounts either "for the benefit of" CBL or "for the further credit of" CBL and a fourth CBL account identified only by account number. These accounts were under the exclusive control of Richard Blech, CBL's President and CEO, not Brandon, the putative trustee. Whether the transfer complied with the CFA, as SECO contends, or violated the CFA, as the Receiver contends, the transfer made by SECO effectively moved the shares into CBL accounts without trust restrictions.

Thus, SECO transferred its shares into CBL accounts and gave CBL the "sole right" to transfer those shares into other accounts, a right CBL exercised. Moreover, the papers CBL furnished to its investors, including SECO, explicitly informed them of the purpose of placing the transferred shares under the sole control of CBL: to reflect assets off its normal balance sheet that would increase the amount of assets available to generate "riskless" arbitrage transactions.

## IV. The Receivership Court's Authority to Order a *Pro Rata* Distribution

█ SECO's transfer of the shares to the defrauders without the protection of an express trust does not, however, necessarily defeat SECO's claim. Under state law,

assets acquired by fraud are subject to a constructive trust for the benefit of the defrauded party. *Restatement (First) of Restitution* § 166 (1937). *See Counihan v. Allstate Insurance Co.,* 194 F.3d 357, 361 (2d Cir.1999) (assets are held subject to constructive trust when "a party … is holding property 'under such circumstances that in equity and good conscience he ought not to retain it' ") (quoting *Miller v. Schloss,* 218 N.Y. 400, 407, 113 N.E. 337 (1916)); *Koreag, Controle et Revision S.A. v. Refco F/X Associates, Inc. (In re Koreag, Controle et Revision S.A.),* 961 F.2d 341, 352 (2d Cir.1992) (applying New York law of constructive trust in a bankruptcy case).

In assessing the significance of whatever constructive trust might have arisen in this context, we note preliminarily that CBL's fraud concerned the false promises made with respect to CBL's sources of income, not with respect to the arrangements under which the shares would be transferred from SECO to CBL. Thus, just as we do not have a case involving shares transferred under an express trust, we also do not have a case where a party is fraudulently deceived into signing transfer papers that it was entitled to believe would have accomplished a transfer under an express trust. The actual transfer documents executed by SECO made clear on their face that SECO was transferring the shares to CBL accounts-not to Brandon and not in trust.

In any event, whatever beneficial interest SECO might have in the transferred shares, arising from a constructive trust, does not defeat the equitable authority of the District Court to treat all the fraud victims alike (in proportion to their investments) and order a *pro rata* distribution. Courts have favored *pro rata* distribution of assets where, as here, the funds of the defrauded victims were commingled and

where victims were similarly situated with respect to their relationship to the defrauders. *See Cunningham v. Brown,* 265 U.S. 1, 13, 44 S.Ct. 424, 68 L.Ed. 873 (1924) (original Ponzi scheme case suspending tracing fiction in context where receivership fund consisted of money acquired by fraud perpetuated against many victims); *Forex,* 242 F.3d at 331–32 (affirming District Court's approval of *pro rata* distribution plan where party's assets were held by defrauder in segregated accounts); *Commodity Futures Trading Commission v. Topworth International, Ltd.,* 205 F.3d 1107, 1115–16 (9th Cir.1999) (affirming District Court's approval of *pro rata* distribution plan where assets were commingled); *United States v. 13328 and 13324 State Highway 75 North,* 89 F.3d 551, 553–54 (9th Cir.1996) ("*Real Property*") (same); *United States v. Durham,* 86 F.3d 70, 73 (5th Cir.1996) (affirming District Court's approval of *pro rata* distribution plan even though the majority of funds were traceable to specific claimants); *Elliott,* 953 F.2d at 1569–70 (affirming District Court's approval of *pro rata* distribution plan even though securities were traceable to claimants).

As the District Court noted, the use of a *pro rata* distribution has been deemed especially appropriate for fraud victims of a "Ponzi scheme," *see Cunningham,* 265 U.S. at 7–9, 44 S.Ct. 424 (describing the scheme of Charles Ponzi), in which "earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity." *Credit Bancorp (Plan) I,* 2000 WL 1752979, at *13; *see also Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1088 n. 3 (2d Cir.1995) (describing characteristics of Ponzi schemes). In such a scheme, whether at any given moment a particular customer's assets are traceable is "a result of the merely fortuitous fact that the defrauders spent the money of the other victims first." *Durham,* 86 F.3d at 72 (internal quotation marks omitted).

SECO points out that three of the decisions relied on by the District Court, *Topworth, Durham,* and *Real Property,* all involved cash, which is fungible, whereas the pending case involves identifiable shares. But *Elliott,* also relied on by the District Court, involved identifiable shares, and the cash at issue in *Durham* and *Forex* was traceable to particular customers. *Pro rata* distributions were approved in all three cases.

*Elliott* is the case most analogous to ours. The investors there executed written agreements "loaning" the securities to the defrauders. They delivered the securities with a power of attorney, in return for a promissory note, which was equal to the market value of the securities and which stated that monthly interest payments would be made. *Elliott,* 953 F.2d at 1568–69. The Eleventh Circuit concluded that "what in fact transpired was that the investors unwittingly transferred legal title in the securities" to the fraudulent investment scheme. *Id.* at 1569. Our case is at least as strong for *pro rata* distribution as *Elliott* because the transfer documents executed by SECO directed its agent at Merrill Lynch to transfer the shares into CBL accounts, SECO agreed that CBL would have authority to transfer the shares out of those accounts, and SECO was informed why CBL (and ultimately the investors) would benefit from having the shares included as off-balance-sheet assets of CBL. Thus, the facts putting SECO on notice that it was not transferring its shares in trust were fully known to SECO, even if it was "unwittingly," *Elliott,* 953 F.2d at 1569, unaware of the legal consequences of these facts.

The cases relied on by SECO that involved Ponzi schemes and permitted the

return of identifiable assets to particular victims are distinguishable. In those cases the reason the assets were returned was not merely because they were traceable, but because the assets had somehow been segregated in the manner of true trust accounts and/or had never been placed in the defrauder's control. *See Black*, 163 F.3d at 196–97 (affirming District Court order allowing return of assets held in custodian accounts that were never pooled or in the control of the defrauder, but noting that District Court had not finally adjudicated distribution and had left open possibility that victims whose assets were pooled might have a cause of action against non-pooled victims); *Anderson v. Stephens*, 875 F.2d 76, 80 (4th Cir.1989) (ordering return of assets that were deposited in defrauder's account after account had been frozen by the district court, on the ground that the asset freeze precluded the bank from conducting further transactions); *City of Philadelphia v. Lieberman*, 112 F.2d 424, 426 (3d Cir.1940) (ordering return of assets that had been placed in actual trust account beyond the control of the insolvent). Also inapposite are cases relied on by SECO that preferred the interests of defrauded victims over the interests of general creditors, *see Gorman v. Littlefield*, 229 U.S. 19, 25, 33 S.Ct. 690, 57 L.Ed. 1047 (1913) (Court refused to allow wrongfully converted property to be used to pay general creditors), or that recognized the claim of the holder of a perfected security interest, *Foothill Capital Corp. v. Clare's Food Market, Inc. (In re Coupon Clearing Service, Inc.)*, 113 F.3d 1091, 1098–99 (9th Cir.1997).[10]

## V. SECO's Opposing Contentions

SECO advances several contentions to defeat the authority of the District Court

to order a *pro rata* distribution. None has merit.

■ *U.C.C. claim.* SECO contends that its claim should be governed by U.C.C. [Rev.] § 8–503(a) (1996), which states that "all interests ... held by the securities intermediary ... for the entitlement holders, *are not property of the securities intermediary*, and are not subject to claims of creditors of the securities intermediary" (emphasis added). But as the District Court noted in rejecting SECO's U.C.C. claim, U.C.C. [Rev.] § 8–503, Official Comment 1, states that in "insolvency proceedings" the applicable "insolvency law" governs. *Credit Bancorp (Plan) I*, 2000 WL 1752979, at *22. An "insolvency proceeding" is "any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate the estate of the person involved." U.C.C. § 1–201(22) (1996). We agree with the District Court that receiverships are "insolvency proceedings," and that the law of federal equity receiverships applies.

■■ *Bailment claim.* SECO characterizes its transactions with CBL as involving the delivery of securities for the purpose of securing future loans or advances. Based on this characterization, SECO contends that its relationship with CBL was that of bailor and bailee, or pledgor and pledgee. SECO notes that under the law of bailment, as the District Court recognized, a bailee acquires only a possessory interests in the property pledged, while the bailor retains legal and equitable title. *See Credit Bancorp (Plan) I*, 2000 WL 1752979, at *26 (" 'In a bailment relationship, title to the property remains in the bailor.' ") (quoting *Ralph A. Veon, Inc. v.*

---

**10.** We decline to follow *Oler v. Lester Harding, Inc.*, 127 F.2d 963, 965 (3d Cir.1942), where the Court, in a diversity action, after noting that *pro rata* distribution might seem more appropriate, felt obliged by state law to order securities returned to customers.

*Hinks (In re Ralph A. Veon, Inc.)*, 12 B.R. 186, 189 (Bankr.W.D.Pa.1981)); *Cornelius v. Berinstein*, 183 Misc. 685, 50 N.Y.S.2d 186, 188 (N.Y.Sup.Ct.1944). SECO's argument fails, however, because, as described above, SECO transferred legal title to the Vintage Petroleum shares to CBL, and the law of bailment therefore does not apply.

■ *Takings Clause claim.* Whether or not a court's action in ordering a *pro rata* distribution among fraud victims is even cognizable under the Takings Clause, *see Corporation of the Presiding Bishop v. Hodel*, 830 F.2d 374, 381 (D.C.Cir.1987) ("The question of whether courts, as opposed to legislative bodies, can ever 'take' property in violation of the Fifth Amendment is an interesting and by no means a settled issue of law."), SECO has no such claim here. SECO transferred its shares into CBL accounts. It was that action that ultimately permitted the District Court to include the shares in the *pro rata* distribution.

## Conclusion

The District Court was entitled to include the Vintage Petroleum shares in the receivership estate (with SECO allowed to recover its shares upon payment of a cash undertaking), and approval of the Compromise Plan was within the Court's equitable discretion. The Orders appealed from are affirmed.